UNITED STATES DISTRICT COURT                    c
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

CHARLES EDWARD LOCKER, II,        CIVIL ACTION NO. 1:21-CV-00823
Plaintiff

VERSUS                           JUDGE DRELL

COMMISSIONER OF SOCIAL           MAGISTRATE JUDGE PEREZ-MONTES
SECURITY ADMINISTRATION,
Defendant

---

## REPORT AND RECOMMENDATION

Before the Court is Charles Edward Locker, II's ("Locker's") appeal of the denial of Social Security disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits by the Commissioner of Social Security (the "Commissioner"). ECF No. 1. The administrative law judge ("ALJ") erred at Step Three of the sequential analysis of Locker's claim. But the error was harmless, and the ALJ's decision is otherwise supported by substantial evidence. Therefore, the Commissioner's decision should be AFFIRMED, and Locker's appeal should be DENIED and DISMISSED WITH PREJUDICE.

## I.   Background

Locker filed an application for period of disability and DIB under Title II of the Social Security Act (the "Act") on May 9, 2019. ECF No. 11-1 at 242. He also applied for SSI under Title XVI. *Id.* at 244. Locker alleges a disability onset date of February 1, 2017, due to back problems and spinal stenosis. *Id.* at 78. Locker's claims were

initially denied by the Social Security Administration ("SSA") on July 30, 2019, and upon reconsideration on October 9, 2019. *Id.* at 83-84, 96, 108-109, 122-123.

Locker's applications were heard before an ALJ on July 8, 2020. *Id.* at 14. Locker appeared with William M. Stampley, a vocational expert ("VE"). *Id.* He also appeared with attorney Laci Hamilton ("Hamilton"). *Id.* The ALJ denied Locker's claims on August 25, 2020. *Id.* at 14-21. The ALJ determined that Locker was not disabled under the Act, finding at step five of the sequential evaluation process that Locker is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. *Id.*

On January 27, 2021, the Appeals Council denied Locker's request for review. ECF No. 11-1 at 5. The ALJ's August 25, 2020 decision thus became the final decision of the Commissioner. ECF No.11-1 at 11.

Proceeding *in forma pauperis*, Locker filed this appeal for judicial review. ECF No. 1. Locker asserts that the Commissioner's decision was based on legal error and is not supported by substantial evidence. ECF No. 1 at 2.[1] *Id.* Locker specifically asserts that he meets Listing 1.04 – Disorders of the Spine, and that the ALJ's mention that he "considered the criteria of Sections 1.00, *et seq.*, in general, of the Listing of Impairments" without discussion of Listing 1.04 is an inadequate analysis

---

[1] Locker also asserted in his appeal that under *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183 (2020) that since the Commissioner's office is unconstitutional, the ALJ's are not constitutionally appointed. In *Collins v. Yellen*, 141 S.Ct. 1761, 1789 (2021), the Supreme Court held that to reverse agency action, the plaintiff must show that the unconstitutional provision inflicted compensable harm. *See Hughes v. Kijakazi*, 2022 WL 1256704, at*19-20 (E.D. La. Mar. 9, 2022). Here, Locker failed to brief any claim concerning the constitutionality of the Commissioner's office or appointment of the ALJ under *Seila*. Therefore, the Court need not further address the claim.

and is harmful error. ECF No. 14 at 8. He further asserts the ALJ committed harmful error under *Kneeland v. Berryhill*, 850 F.3d 749 (5th Cir. 2017) by failing to make reasonable efforts to obtain one or more treating or examining source opinion(s) on Locker's impairment-related limitations affecting his ability to work. *Id.* at 9.

## A.    Administrative Hearing

At the July 8, 2020 telephonic administrative hearing, Locker's attorney Hamilton stated he had a history of back problems, recently underwent a discectomy surgery, was diagnosed with disc bulges and protrusions and compression of the nerve root, and had "neurogenic claudication as well (audio gap) going in the lumbar spine." ECF No. 11-1 at 48. Hamilton argued that Locker's severe and chronic symptoms limited his ability to sit, stand, and walk. *Id.* She noted that a medical source statement shows Locker was capable of very limited walking and a short duration of sitting as well as problems sitting, standing, or walking for more than two hours at a time and lifting more than 10 pounds. *Id.* at 49. Hamilton argued Locker would have problems with maintaining a consistent work schedule and may need several breaks or absences that would not be tolerated in a competitive work environment. *Id.*

Locker is a high school graduate with no additional vocational training. *Id.* at 50. He last worked in 2017 and had a sporadic job in 2018. *Id.* at 51. He worked in 2017 for about a month at Lucky Horseshoe at a convenience store. *Id.* The ALJ noted his past work at Lucky Horseshoe instead showed 2011, with no wages shown after 2014. *Id.* Locker believed he last filed taxes in 2017. *Id.*

3

For six months, he was a housekeeping supervisor for Jena Choctaw. *Id.* at 52. He cleaned the machines on the gambling floor, took out the trash, and cleaned up after the food beverage service. *Id.* In 2013, Locker was self-employed as a property manager for individuals in Tennessee and Georgia. *Id.* at 53. He managed properties in Alexandria by picking up rent, putting people in the houses, taking care of the properties, and calling for plumbing work among other things. *Id.*

Locker also worked at the Highway 28 East Chevron in 2011 and 2012, with some additional self-employment in 2011, in addition to Lucky Horseshoe. *Id.* Locker also managed properties in 2011. *Id.* Locker testified the Lucky Horseshoe was a corporation that managed the payroll of the convenience store at which he worked. *Id.* He was a convenience store clerk manning the register, stocking shelves, selling gas, and taking deliveries. *Id.* at 53-54. But he did not manage, hire, or fire employees. *Id.* at 54. He was also self-employed in 2010 managing properties. *Id.* Locker also worked as a store clerk with Pelican State Oil, another convenience store. *Id.* He was employed in 2008 at AP Group but did not recall that work. *Id.* And he worked at Dollar General from 2008 into 2009. *Id.*

Locker testified he was a keyholder at one of his jobs and an assistant manager at another. *Id.* He was employed at Fortune RD Holdings in 2008 as a property manager for an apartment complex out of Tulsa, Oklahoma. *Id.* at 55. Locker stated that the two gentlemen owned an apartment complex in Lafayette and in Texas, as well as the one in Tulsa, Oklahoma. *Id.*

Locker also worked for Forest Lawn in 2008 as a groundskeeper helping with burials.  *Id.*  He worked retail sales for Dillard's in 2007.  *Id.*  He worked for NAI Commercial Management in 2007 as a property manager.  *Id.* at 56.  He also worked as a line tech on the assembly line for Boise Cascade.  *Id.*  There, he worked with finished plywood but did not do any finishing work.  *Id.*

The ALJ confirmed Locker's problems were mostly in his lumbar spine and to some degree in his neck.  *Id.*  Locker testified his back hurts all the time and radiates into his legs. *Id.* at 56-57.  And he stated he has neck problems that sometimes radiate down his right arm.  *Id.* at 57.

Locker had a discectomy at the beginning of 2020.  *Id.*  He felt a little bit of improvement but fell again.  *Id.*  About a week later, he fell out of his bed again.  *Id.* He felt like he was paralyzed from the waist down and had no feeling in his legs.  *Id.* He went to the hospital to be examined because he "couldn't feel [his] legs right."  *Id.* He was told to go back to the doctor and was rescheduled from February or March to see Dr. Sen again in Shreveport.  *Id.* at 57-58.  He was rescheduled due to COVID and was seen the month before the hearing.  *Id.* at 58.  At the time of the hearing, Locker was scheduled to have an MRI in September of 2020 to determine if they would perform another surgery.  *Id.*

Locker testified he could not walk from the front to the back of the Wal-Mart store without tiring out and stumbling.  *Id.*  He must shop from a motorized scooter. *Id.*

Prior to his discectomy, Dr. Sen performed an "epidural in [his] back" two separate times. *Id.* Locker testified that neither one worked for more than a week. *Id.* One worked for four days and the other worked for six days. *Id.* When the pain returned, it was tenfold. *Id.* Locker's lower back was his more significant problem. *Id.* at 59. He was falling before the discectomy. *Id.* He could not go 10 or 15 steps without stumbling and had his walker with him. *Id.* He fell four to five times a week on a weekly basis. *Id.* He did not go to the doctor every time he fell, but he did when he could not walk or function due to pain. *Id.*

Locker received shots in his back to lessen the pain, as well as steroid shots. *Id.* He tried heat therapy and acupuncture. *Id.* He testified that he reinjured himself to the point his discectomy won't hold. *Id.* at 60. Locker's discectomy was at Level L5-S1. *Id.* Locker testified his doctor discussed a fusion at that level and into the L3-4-5 and S1. *Id.* at 61.

Locker is 5'8-1/2" and weighs 230 pounds. *Id.* His doctors recommended that he be lighter at that height. *Id.* He stated he walks with his walking cane or walker and tries to do as much as he can. *Id.* at 61-62. Locker testified he has some range of motion issues, primarily limited by pain. *Id.* at 62. He cannot stand for longer than ten minutes. *Id.* at 62-63. Then, his back will hurt, and his legs will cramp with uncontrollable pain radiating down his legs. *Id.* at 63. He obtained his own walking cane because he was falling so much. *Id.* He testified he always has it with him. *Id.* He must lie down or recline back in his recliner for relief. *Id.* at 63-64.

Locker uses a heating pad for pain. *Id.* at 64. He also performs stretching exercises. *Id.* He continues to use a walker but testified it was not something that was currently prescribed for him. *Id.* at 65.

Locker periodically drives, but just for about 10 to 15 minutes before he must stand up. *Id.* He testified that he drives to Shreveport but must stop along the way at least three times to stretch. *Id.* He stated his back and legs go into spasms. *Id.* at 66. For his drive from Dry Prong to Shreveport, he must stop every 20 to 30 minutes. *Id.*

Locker further testified that he usually has a friend get his groceries. *Id.* Locker stated that if he gets his groceries and picks up a gallon of milk, his lower back hurts to the point he may fall. *Id.* at 66-67. He cannot pick up a jug of milk from the ground without any assistance. *Id.* at 67. And he sometimes has problems with picking up small items. *Id.* Locker testified that when his arm is hurting, he can hardly open a can of coke without sharp pains, mostly in his right arm. *Id.* at 68. He sometimes has good use of his fingers and palms, but not always, due to pain. *Id.*

Locker lives with his friend Healy, a 51-year-old adult male who still works outside of the home. *Id.* Locker does not assist his friend with any daily activities. *Id.* Sometimes his friend must assist him out of the bathtub. *Id.* at 69. But Locker can prepare a simple meal for himself when his friend is at work or away. *Id.*

Regarding household chores, Locker cannot stand for very long and never cooks. *Id.* His friend takes care of the cooking and cleaning. *Id.* Locker cannot bend down to get the laundry out of the washing machine or the dryer. *Id.* His friend does

the laundry, vacuuming, and sweeping.  *Id.*  Locker can load the washing machine if the basket is high enough where he can reach it.  *Id.*  He can also load dirty clothes into the washing machine.  *Id.* at 70.  Locker testified that he helps fold and put away laundry as much as he can.  *Id.*  His friend does all the outside chores such as landscaping, weeding, and grass cutting.  *Id.*  On a typical day, Locker stated he will sit around, then stand up and walk a little, then sit down again.  *Id.* at 71.  He also spends time on his front porch.  *Id.*

The VE testified that Locker's past work consists of manager property, DOT[2] number 186.167-046, light, skilled SVP level 8; sales attendant, DOT number 299.677-010, light, unskilled, SVP level 2; executive housekeeper, DOT number 187.167-046, light, skilled, SVP level 8; cashier/check, DOT number 211.462-014, light, SVP level 3; stock clerk, DOT number 299.367-014, heavy, semi-skilled, SVP level 4; cemetery worker, DOT number 406.684-010, heavy, skilled, SVP level 5; and truss assembler, DOT number 762.684-062, heavy, skilled, SVP level 5.  *Id.* at 71-72.

The ALJ asked the VE to assume a hypothetical individual with Locker's age, education, and vocational background, limited to a range of sedentary work with the following exertional limitations:  occasional climbing of ramps and stairs, never climbing ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, crouching, or crawling; requires a cane for balance and ambulation over uneven surfaces; and no other limitations.  *Id.* at 72.  The ALJ asked the VE if, based on those

---

[2] Dictionary of Occupational Titles.

limitations, whether that hypothetical individual could perform the demands of Locker's past work. *Id.* The VE testified that the individual could not. *Id.*

The ALJ asked if there is other work in the national economy that a person with those limitations could perform. *Id.* The VE testified that there are other jobs in the national economy that such an individual could perform. *Id.* The VE stated that the individual could work the following jobs: (1) call-out operator, DOT number 237.367-014, sedentary, unskilled, SVP level 2 (48,870 jobs in the national economy); (2) documentary preparer, DOT number 249.587-018, sedentary, unskilled, SVP level 2 (436,385 jobs in the national economy); and (3) cutter and paster, DOT number 249.587-014, sedentary, unskilled, SVP level 2 (60,775 jobs in the national economy). *Id.*

The ALJ asked the VE what the tolerance was for off-task behavior and absenteeism in the national economy. *Id.* at 73. The VE testified that if a person is off-task 15 percent of the time or more that would not be tolerated by most employers. *Id.* And a lot of employers will allow a person one day a month, but anything in excess of that will eventually lead to termination. *Id.*

## B.  ALJ's Findings

To determine disability, the ALJ applied the five-step sequential process outlined in 20 C.F.R. §§ 404.1520(a), 416.920(a). The sequential process required the ALJ to determine whether Locker: (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Appendix 1"); (4) is unable to do the kind of

work he did in the past; and (5) can perform any other type of work. If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. *See Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (citing *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

An applicant bears the initial burden of showing that he is disabled. Under the regulations, this means the claimant bears the burden of proof on the first four steps of the sequential analysis. Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant can perform work in the national economy. *See Greenspan*, 38 F.3d at 237.

Here, the ALJ found Locker met the insured status requirements of the Act through March 31, 2019. ECF No. 11-1 at 16. He found that Locker had not engaged in substantial gainful activity since his alleged onset date of February 1, 2017. *Id.* In step two and three of the sequential evaluation, the ALJ determined that Locker suffered severe impairments of degenerative disc disease of the lumbar spine, osteoarthritis, and obesity. *Id.* But the ALJ concluded that Locker did not have an impairment or combination of impairments that meets or medically equals the severity of any of the listed impairments in Appendix 1. *Id.* at 17.

The ALJ determined Locker retained the RFC to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a) except occasional climbing of ramps and stairs, never climbing ladders, ropes, or scaffolds, occasional balancing, stooping,

10

kneeling, crouching, or crawling, and with the use of a cane for balancing and ambulating over uneven surfaces. *Id.* He concluded that Locker's RFC precluded him from performing any past relevant work. *Id.* at 19.

He further found that Locker – 45 years old on his alleged onset date – was a younger individual with at least a high school education. *Id.* Transferability of job skills was not material to the ALJ's determination of disability because he found that using the Medical-Vocational Rules as a framework supported a finding that the claimant was "not disabled." *Id.*

The ALJ also determined that, considering Locker's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Locker could have performed. *Id.* The ALJ concluded that Locker had not been under a disability, as defined in the Act, from February 1, 2017, the alleged onset date, through the date of his decision. *Id.* at 20.

## II.    Law and Analysis

### A.    Scope of Review

In considering Social Security appeals, the Court is limited by 42 U.S.C. § 405(g) to a determination of whether "substantial evidence" exists in the record to support the Commissioner's decision, and whether there were any prejudicial legal errors. *See McQueen v. Apfel*, 168 F.3d 152, 157 (5th Cir. 1999). For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. *See Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994) (citing *Richardson v. Perales*, 402

U.S. 389, 401 (1971)).  Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision, but must include a scrutiny of the record as a whole.  The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight.  *See Singletary v. Bowen*, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder.  *See Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987); *Dellolio v. Heckler*, 705 F.2d 123, 125 (5th Cir. 1983).  The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than a court.  *See Allen v. Schweiker*, 642 F.2d 799, 801 (5th Cir. 1981); *see also Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).  A court does have authority, however, to set aside factual findings that are not supported by substantial evidence, and to correct errors of law.  *See Dellolio*, 705 F.2d at 125.  But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence."  *See Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988); *Dellolio*, 705 F.2d at 125.

**B.**    **The ALJ erred in his Step Three analysis, but the error was harmless and does not warrant remand.**

Locker argues that the ALJ offered no analysis of Listing 1.04, broadly dismissing his obligation at Step Three of the sequential evaluation.  ECF No. 14 at 8.  Locker states there was ample medical evidence showing that he could reasonably meet a listing.  *Id.* at 8-9.  He claims the ALJ failed to discuss the evidence and

summarily dismissed a Step Three analysis, constituting an error requiring remand. *Id.* at 9 (citing *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007)).[3]

The Commissioner argues that Locker must show the ALJ failed in his listings analysis, and that the error affected Locker's substantial rights. ECF No. 17 at 14. The Commissioner further argues that Locker fails to cite medical evidence satisfying a 1.04A or 1.04C Listing. *Id.* at 15-16.

At Step Three of the sequential evaluation, a claimant will be found disabled if his impairment meets or equals one of the listings in the Listings of Impairments. 20 C.F.R. § 404.1520(a)(4)(iii). The Listing of Impairments describes for each of the major body systems impairments that are considered to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 404.1525(a).

A claimant bears the "burden of establishing that his impairment meets or equals the criteria for presumptive disability described in the listings." *Whitehead v. Colvin*, 820 F.3d 776, 781 (5th Cir. 2016) (citing *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991)). "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." *Id.* (quoting *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original)). An impairment that manifests only some

---

[3] The United States Court of Appeals for the Fifth Circuit has explained that *Audler* does not stand for the proposition that the ALJ's failure to address a claimant's argument always warrants remand. *See Hurst v. Colvin*, 639 Fed.Appx. 1018, 1021 (5th Cir. 2016). The court "remanded Audler's claim for further proceedings only after analyzing the record, which included uncontradicted evidence of severe limitations, and concluding that '[a]bsent some explanation from the ALJ to the contrary, Audler would appear to have met her burden of demonstrating' that her condition met the requirements of a condition listed in Appendix 1." *Id.*

of those criteria, no matter how severely, does not qualify. *Zebley*, 493 U.S. at 530. If an impairment does not meet the criteria, it may be medically equivalent to a listed impairment if it is at least equal in severity and duration to the criteria of any listed impairment. 20 C.F.R. § 416.926(a).

At Step Three, the ALJ should identify the listed impairment for which the claimant's symptoms fail to qualify and provide an explanation as to how the ALJ reached the conclusion that the claimant's symptoms are insufficiently severe to meet any listed impairment. *Audler*, 501 F.3d at 448 (holding that "the ALJ erred in failing to state any reason for her adverse determination at step 3"). A "bare conclusion" that a claimant does not meet the criteria of any Listing "is beyond meaningful judicial review." *Id.* (quoting *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996)).

However, even if a court determines that the ALJ erred in failing to state the reasoning for an adverse determination at Step Three, a reviewing court must still determine whether the error was harmless. *Audler*, 501 F.3d at 448 (citing *Morris v. Bowen*, 864 F.2d 333, 334 (5th Cir. 1988)). Procedural perfection is not required in administrative proceedings, and a court will not vacate a judgment unless "the substantial rights of a party have been affected." *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988). "That showing typically requires a claimant to demonstrate that her impairment satisfies the criteria of a particular listing." *Smith v. Astrue*, 914 F. Supp. 2d 764, 784 (E.D. La. 2012) (citing *Audler*, 501 F.3d at 448-49).

Listing 1.04[4] (Disorders of the Spine) provides, in pertinent part:

---

[4] Effective April 2, 2021, the SSA revised the criteria in the Listing of Impairments used to evaluate claims involving musculoskeletal disorders under Titles II and XVI of the Act. *See*

*Disorders of the spine* (e.g. herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A.    Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or

B.    Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or

C.    Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R., Pt. 404, Subpt. P, App. 1.

"Listing 1.04A uses the conjunction 'and' when enumerating the medical criteria in order to establish that the entire set of criteria must be present at the same time on examination." *Matthews v. Soc. Sec. Admin.*, CV 18-00246, 2019 WL 3432336, at *6 (W.D. La. Apr. 5, 2019), *report and recommendation adopted sub nom. Matthews v. U.S. Comm'r of Soc. Sec.*, 6:18-CV-00246, 2019 WL 3431604 (W.D. La. July 29, 2019) (citing Social Security Acquiescence Ruling ("AR") 15-1(4), *Radford v.*

---

Revised Medical Criteria for Evaluating Musculoskeletal Disorders, 85 FR 78164-01, 2020 WL 7056412. Listing 1.04 was removed without replacement and new listings were created incorporating and clarifying the provisions of the Listing 1.04 criteria. These new rules apply to new applications filed on or after the effective date and to claims that are pending on or after the effective date. *Id.* Here, the final decision was rendered on August 25, 2020. ECF No. 11-1 at 11. Thus, the new rules were not in effect at the time of the final decision and there is no dispute that Listing 1.04 governed the ALJ's musculoskeletal disability analysis. ECF Nos. 14 at 8, 17 at 14. Therefore, the Court examines the ALJ's decision under the previous listing rules in effect at the time.

*Colvin: Standard For Meeting The Listing For Disorders Of The Spine With Evidence Of Nerve Root Compression*, 2015 WL 5697481, at \*4). Under the AR, the "the claimant must also demonstrate that she met the listing criteria for a period that lasted or is expected to last at least twelve months." *Id.* (citations omitted); *see also* 20 C.F.R. Part 404, Subpt. P, App. 1, § 1.00(B)(2).

The introductory paragraphs of Section 1.00 listings clearly state that a claimant is required to prove a loss of function as a result of a musculoskeletal impairment by demonstrating either an ". . . inability to ambulate effectively on a sustained basis . . . , or the inability to perform fine and gross movements effectively on a sustained basis . . . ." 20 C.F.R. Part 404, Subpt. P., App. 1, § 1.00(B)(2)(a); *Audler*, 501 F.3d at 448–49. And, "[t]he inability to ambulate effectively or the inability to perform fine and gross movements effectively must have lasted, or be expected to last, for at least 12 months." 20 C.F.R. Part 404, Subpt. P., App. 1, § 1.00(B)(2)(a).

Further, a claimant meets or equals Listing 1.04C where he has lumbar spinal stenosis resulting, among other things, in an "inability to ambulate effectively, as defined in 1.00B2b." *Id.* § 1.04C. Under listing 1.00B2b, an inability to ambulate effectively means "an *extreme* limitation of the ability to walk[.]" *Id.* § 1.00B2b(1) (emphasis added). Examples include "the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking,

and the inability to climb a few steps at a reasonable pace with the use of a single hand rail." *Id.* § 1.00B2b(2).

Here, the ALJ determined at Step Two that Locker had the severe impairments of degenerative disc disease of the lumbar spine, osteoarthritis, and obesity. ECF No. 11-1 at 16. At Step Three, the ALJ found that Locker does not have an impairment or combination of impairments that meets or medical equals the severity of one of the listed impairments in Appendix 1. ECF No. 11-1 at 17. The ALJ noted that "the valid and objective evidence of record discussed herein indicates that, although the claimant's impairment was 'severe' within the meaning of the Regulations, such was not severe enough to meet or medically equal, either singly or in combination, one of the impairments listed in Appendix 1[.]" *Id.* The ALJ stated that he "considered the criteria of Sections 1.00, *et seq.*, in general, of the List of Impairments and SSR 19-2p." *Id.*

The ALJ noted that he carefully considered Locker's allegations, but the evidence in the record did not establish that Locker's impairment met or equaled the severity of a Listing. *Id.* Although the ALJ did not identify the Listing of which Locker failed to qualify, instead generally referring to "Sections 1.00, *et seq.*, in general," he pointed to his discussion of the record evidence in his RFC determination. *Id.* The ALJ did not provide any specific discussion or comparison of the medical evidence with the criteria for any relevant listing in his Step Three analysis. Thus, the ALJ erred at Step Three by failing to identify a Listing and failing to provide an

explanation for his determination that Locker failed to meet a Listing. *See Audler*, 501 F.3d at 448.

However, the fact that the ALJ did not explicitly analyze each listing in comparison to the medical records at Step Three was harmless error. *See Dise v. Colvin*, 630 Fed.Appx. 322, 325 (5th Cir. 2015). "[P]rocedural improprieties constitute a basis for remand only when the improprieties cast into doubt the existence of substantial evidence to support the ALJ's decision." *Id.* (citing *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988)). An ALJ's failure to explain the basis for his decision in Step Three affects substantial rights when the claimant appears to meet his burden to demonstrate that he meets or equals a Listing. *Audler*, 501 F.3d at 449.

In *Audler*, in considering whether a Step Three error was harmless, the Fifth Circuit reviewed the evidence to determine whether the claimant had demonstrated that she satisfied all the criteria of the Listing at issue. *Audler*, 501 F.3d at 448-49. There, the record included findings from Audler's treating physician that satisfied Listing 1.04, including symptoms of nerve root compression and positive straight-leg raising test. *Id.* at 449. No medical evidence was introduced to contradict those findings. *Id.* The Fifth Circuit held that Audler met her burden to demonstrate she met Listing 1.04, and that the ALJ's failure to set out the bases for her decision at Step Three affected her substantial rights. *Id.*

Here, Locker asserts the record evidence shows compromise of a nerve root (including cauda equine) (ECF No. 11-1 at 374-75, 380, 400, 403, 441); nerve root compression (ECF No. 11-1 at 374-75, 381); positive straight-leg raising (ECF No. 11-

18

1 at 381); spinal stenosis (ECF No. 11-1 at 381, 400, 403, 502); pseudoclaudication (ECF No. 11-1 at 381, 502); and an inability to ambulate effectively (ECF No. 11-1 at 58, 62, 469).   ECF No. 14 at 9.   Locker argues the evidence supports that he meets Listing 1.04A or 1.04C.   *Id.*

Although the ALJ did not necessarily explain how Locker's impairment did not qualify as a listing at Step Three, the ALJ fully considered the medical evidence in support of his conclusion that Locker failed to meet a Listing.   In his RFC finding, the ALJ considered the medical evidence indicating a history of back pain radiating into the lower extremities.   ECF No. 11-1 at 18.   He noted evidence of a July 17, 2017 MRI of the lumbar spine revealing disc bulges at the L1-2, L3-4 through L5-S1 with disc protrusion.   ECF No. 11-1 at 18, 374.   The MRI noted mild bilateral lateral recess narrowing, contacting the descending L5 nerve roots, however without effacement. *Id.* at 374.   No regions of canal stenosis were noted on that MRI.   *Id.*

But Locker's medical records reflect no sensory deficits, and normal reflexes, strength, and motor functioning since December 2016.   ECF No. 11-1 369, 381, 411, 424, 440-41, 442, 461, 463, 489, 494.   In January of 2017, Locker sought treatment for back pain and a head cold, requesting a second opinion after seeing a neurosurgeon in Shreveport and "being advised 'nothing wrong.'"   ECF No. 11-1 at 368.   On examination, Locker had no motor or sensory deficits, normal neurological findings, but slow, cane-assisted gait, positive straight leg raise, and pain and limitation in his low-mid back range of motion.   *Id.* at 369.

19

Locker's records also show that on March 29, 2017, Dr. Cuong Bui ("Dr. Bui") evaluated Locker for a second opinion after Neurosurgery at LSU Shreveport did not feel Locker's degenerative disc disease was surgical. ECF No. 11-1 at 442. On examination, Dr. Bui noted normal gait, full range of motion of all extremities, 5/5 muscle strength, normal tone, no sensory deficits, normal reflexes, and negative straight leg-raise testing. *Id.* Dr. Bui noted that the lumbar spine MRI showed disc degeneration at L4-5 and L5-S1 with disc bulge but no frank herniation and no significant foraminal narrowing or central stenosis. *Id.*

The ALJ discussed a February 2019 CT of the lumbar spine that showed degenerative disc disease/facet arthropathy predominantly on the right side at the L5/S1 with nerve root compression and stenosis. ECF No. 11-1 at 18, 400. He noted that an April 2019 examination revealed antalgic gait with positive straight leg raises but with intact reflexes and sensory. ECF No. 11-1 at 18, 381. In May of 2019, a neurosurgeon observed Locker was using a cane to ambulate, but motor sensory examination was within normal limits. ECF No. 11-1 at 18, 461. He noted Locker was referred to physical therapy and prescribed pain medications. *Id.*

Locker argues that Dr. Devon LeFever ("Dr. LeFever") wrote down at that May 2019 visit that Locker's bowel and bladder incontinence and saddle anesthesia were signs of cauda equina. ECF No. 14 at 5. However, the record actually states that Dr. LeFever "[d]iscussed with patient [the] warning signs of cauda equina including bladder and bowel incontinence, weakness, or saddle anesthesia" and told him to go

20

to the emergency department "*should these symptoms develop*." ECF No. 11-1 at 441 (emphasis added). There was no mention that Locker in fact had those symptoms.

An emergency room visit on July 18, 2019 for complaints of right sided pain and nerves tensing revealed no impairment of sensory functions and no neurological signs or symptoms. *Id.* at 476. On neurosurgical follow-up on August 30, 2019, Locker reported worsening symptoms of low back pain radiating to the right lower extremity. *Id.* at 462. Examination again showed motor sensory examination was within normal limits. *Id.* at 463.

The ALJ further observed a September 2019 MRI of the lumbar spine revealing bilateral neuronal foraminal narrowing at the L4-L5 and L5-S1 due to facet hypertrophy and mild multilevel disc degenerative changes. ECF No. 11-1 at 18, 484. The MRI demonstrates "the nerve roots of the cauda equina appear normal." *Id.* at 484. The ALJ stated that, on neurosurgical follow-up, Locker showed little relief from physical therapy and surgical intervention was recommended. ECF No. 11-1 at 18, 487-490. At this November 2019 visit, an exam revealed 5/5 strength, normal reflexes. ECF No. 11-1 at 489. On January 7, 2020, Locker was seen for a pre-operation visit which showed 5/5 strength and normal reflexes. ECF No. 11-1 at 494. The ALJ noted Locker underwent a right L5/S1 METRx discectomy on January 8, 2020. ECF No. 11-1 at 18, 503-505.

The ALJ stated that on post-operative follow-up on February 7, 2020, Locker reported some improvement of right lower extremity radiculopathy, but had some left-sided leg and back pain. ECF No. 11-1 at 18, 513-516. The physical examination

21

revealed Locker's incision was healing nicely with no rubor, erythema, or swelling. ECF No. 11-1 at 18. The ALJ observed that Locker was noted to ambulate well with a non-antalgic and steady gait, and that he was referred for physical therapy. *Id.* The examiner noted Locker was progressing as expected post-op and that he was told he should continue to slowly improve. *Id.*

The ALJ determined that the medical evidence does not generally support the claimant's alleged loss of functioning. ECF No. 11-1 at 18. He found that, while Locker testified to significant limitations, he did not find they are supported by the overall record. *Id.*

It is clear the ALJ considered the submissions by Locker concerning his disability, but properly evaluated the record as a whole which shows substantial evidence to support the ALJ's determination that Locker does not satisfy Listing 1.04. Locker's medical records reflect no sensory deficits, and normal reflexes, strength, and motor functioning since December 2016. ECF No. 11-1 at 369, 381, 411, 424, 440-41, 442, 461, 463, 489, 494. Also, although Locker testified he used a cane he personally obtained – and the same was occasionally observed in his medical records – there was no record evidence of an extreme limitation of the ability to walk. And, as the record shows on post-surgery follow-up Locker ambulated well with a non-antalgic and steady gait, was progressing as expected, and was told he should continue to slowly improve. *Id.* at 513-516.

Regardless, the ALJ accounted for Locker's testimony concerning his limitations and observations in his records concerning his use of a cane by limiting

Locker to sedentary work in his RFC finding, including the "use of a cane for balancing and ambulating over uneven surfaces" and postural limitations. ECF No. 11-1 at 19. Thus, Locker has not met his burden at Step Three to establish he meets the criteria of Listing 1.04. Locker fails to demonstrate his substantial rights have been affected by the ALJ's error. *See Mays*, 837 F.2d at 1364. The ALJ's error in failing to adequately analyze whether Locker satisfied a listing at Step Three was harmless. The ALJ's findings that Locker's impairment or combination of impairments did not meet or medically equal the criteria of Listing 1.04 are supported by substantial evidence. And a reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Johnson*, 864 F.2d at 343; *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).

### C. The record was sufficient for the ALJ to render a decision on Locker's impairment-related limitations affecting his ability to work.

Locker argues the ALJ committed harmful error under *Kneeland* by failing to make reasonable efforts to obtain one or more treating or examining source opinion(s) on Locker's impairment-related limitations affected his ability to work. ECF No. 14 at 2. Locker concedes that the regulations regarding the evaluation of medical opinion evidence changed effective March 27, 2017. *Id.* at 10 (citing 20 C.F.R. §§ 404.1520c, 416.920c).[5] Locker argues that the ALJ based his decision solely on the

---

[5] On January 18, 2017, the SSA published revised regulations concerning how the agency considers medical opinion evidence in disability determinations. *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 F.R. 5844, 2017 WL 168819 (Jan. 18, 2017). The new regulations provide that, for claims filed on or after March 27, 2017, the Commissioner will no longer "defer or give any specific evidentiary weight, including

opinion evidence of state agency reviewers Dr. Louis Hargus's ("Dr. Hargus's") and

Dr. Timothy Honigman's ("Dr. Honigman's"), which he found persuasive.  *Id.* at 11.

But Locker claims that Dr. Hargus's and Dr. Honigman's opinions are not supported

by substantial evidence, and that the ALJ has a duty on remand to develop the record

by seeking "readily obtainable examining and/or treating opinion evidence, such as

an opinion statement from neurosurgeon Sin and/or a post-hearing consultative

examination."  *Id.*

The Commissioner argues that the record contained sufficient longitudinal

evidence for the ALJ to properly assess Locker's disability status, and that a treating

source's or consultative examiner's opinion was not required for an adequately

---

controlling weight, to any medical opinion(s)," including those from treating physicians. 20
C.F.R. § 404.1520c(a); 20 C.F.R. § 416.920c(a).  The revised regulations did not retain the
longstanding "treating source rule," which requires deference to treating source opinion
evidence in absence of certain other specific findings. *See* 20 C.F.R. § 404.1527, 20 C.F.R. §
416.927.

Under the new regulations, rather than assigning weight to the medical opinions, the
Commissioner must articulate "how persuasive" he finds the medical opinions. 20 C.F.R. §
416.920c(b).  And the Commissioner's consideration of the persuasiveness of medical opinions
is guided by the following factors:  (1) supportability; (2) consistency; (3) relationship with
the claimant (including the length of the treatment relationship, the frequency of
examinations, the purpose of the treatment relationship, the extent of the treatment
relationship, and the examining relationship); (4) specialization of the medical source; and
(5) any other factors that tend to support or contradict the opinion. 20 C.F.R. §
404.1520c(c)(1)-(5); 20 C.F.R. § 416.920c(c)(1)-(5).

"Supportability" and "consistency" are the most important factors. 20 C.F.R. §
404.1520c(b)(2); 20 C.F.R. § 416.920c(b)(2).  The ALJ must explain these factors, but he need
not expound on the remaining three unless he finds that two or more non-identical medical
opinions are equally well-supported and consistent with the record. *Id.* at § 416.920c(b)(2)-
(3).  Furthermore, the fact that a medical source actually examined the claimant or
specializes in an area germane to the claimant's medical issues are not primary or dispositive
considerations in assessing the medical opinion. *See* 20 C.F.R. § 404.1520c(c); 20 C.F.R. §
416.920c(c).

developed record.  ECF No. 17 at 12.  The Commissioner further asserts that Locker's claim of legal error is based on caselaw interpreting the prior regulatory authority. *Id.*

An ALJ has a duty to "develop the facts fully and fairly" relating to an applicant's claim for disability benefits.  *Robinson v. Kijakazi*, CV 21-885, 2022 WL 2865857, at *10 (E.D. La. June 21, 2022), *report and recommendation adopted*, CV 21-885, 2022 WL 2828835 (E.D. La. July 20, 2022) (citing *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995); Thorton v. Schweiker, 663 F.2d 1312, 1316 (5th Cir. 1981) ("[T]he ALJ has a special responsibility to develop a full and fair record upon which to base his decision.")).  Addressing the same argument as here, this Court recently stated:

> In *Kneeland*, the court stated that, "the reports of physicians who did not examine the claimant, taken alone, would not be substantial evidence on which to base an administrative decision." *Kneeland v. Berryhill*, 850 F.3d 749, 761 (5th Cir. 2017) (internal quotation marks omitted) (quoting *Strickland v. Harris*, 615 F.2d 1103, 1110 (5th Cir. 1980)). The language in *Kneeland*, however, constitutes dictum because in that case there was a medical opinion from an examining source that the ALJ ignored. *Kneeland, supra.*

> Furthermore, in *Strickland*, the court noted that the "reports of physicians who did not examine the claimant, taken alone, would not be substantial evidence on which to base an administrative decision." *Strickland*, 615 F.2d at 998 (internal quotation marks omitted) (quoting *Johnson v. Harris*, 612 F.2d 993, 998 (5th Cir. 1980)). In that case, however, the report of the non-examining agency physician was not supported by the findings of the examining or treating physicians. *Id.*

> In *Johnson*, the Fifth Circuit stated,

> *Richardson v. Perales*, 402 U.S. 389, 402, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842, 853 (1971) holds that a written report by a licensed physician who has examined a claimant can constitute substantial

evidence on which to support an administrative decision to deny social security benefits. If it is true that the physicians who reported on Johnson's condition did not even see him, this alone would not be substantial evidence on which to base an administrative decision. Whether these physicians did see Johnson or had other adequate acceptable information before making their reports is *another* inquiry to pursue at the further hearing.

*Johnson*, 612 F.2d at 998 (emphasis added). Again, however, the statement that reports from non-examining physicians alone do not constitute substantial evidence was dictum.

Of course, another important distinction between this case and *Kneeland* and its predecessors is that the latter cases all were decided prior to the still recent amendment to the regulations. For claims filed on or after March 27, 2017, the Commissioner no longer affords "controlling weight" to the opinions of treating physicians and will not defer or give any specific evidentiary weight to any medical opinion(s) from the claimant's medical sources. 20 C.F.R. §§ 404.1520c(a) and 416.920c(a). Furthermore, the fact that a medical source actually examined the claimant or specializes in an area germane to the claimant's medical issues are not primary or dispositive considerations in assessing the medical opinion. *See* 20 C.F.R. §§ 404.1520c(c) and 416.920c(c). Rather, when determining the persuasiveness of a medical opinion, the most important factors are supportability and consistency. 20 C.F.R. §§ 404.1520c(b)(2) and 416.920c(b)(2).

*Johnson v. Kijakazi*, CV 3:21-01128, 2022 WL 3273628, at *7–8 (W.D. La. July 27, 2022), *report and recommendation adopted*, CV 3:21-01128, 2022 WL 3230433 (W.D. La. Aug. 10, 2022).

The Court went on to say:

Under the current regulations, however, the Commissioner will not recontact a medical source or otherwise purchase a consultative examination if all of the medical opinions of record are consistent and there is sufficient evidence for the Commissioner to render a decision. *See* 20 C.F.R. §§ 404.1520b(a) and 404.1519a. Indeed, the ALJ need not order a consultative examination at government expense "unless the record establishes that such an examination is necessary to enable the administrative law judge to make the disability decision." *Pierre v. Sullivan*, 884 F.2d 799, 802 (5th Cir. 1989) (quoting *Turner v. Califano*, 563 F.2d 669, 671 (5th Cir. 1977)). Here, the record sufficed for the ALJ

to render a decision. In fact, at the hearing, Johnson, via counsel, acknowledged that he had viewed the record, had no objection to same, and that, to his knowledge, it was complete. (Tr. 33).

*Johnson*, 2022 WL 3273628, at *8.

Here, just as in *Johnson,* Locker's reliance on *Kneeland* for a treating source opinion is misplaced because the SSA eliminated the treating source rule for claims filed on or after March 27, 2017, such as here. Moreover, nothing in the record suggests that the ALJ needed any more medical information to reach an informed decision about whether Locker was disabled. At the administrative hearing, Hamilton agreed that the record was complete. ECF No. 11-1 at 46. And Hamilton had no follow-up questions to the ALJ's questioning of Locker or the VE. The record was sufficient.

Thus, an examination need not be purchased "unless the record establishes that such an examination is necessary to enable the administrative law judge to make the disability decision." *See Anderson v. Sullivan*, 887 F.2d 630, 634 (5th Cir. 1989). And Locker failed to show prejudice in the form of evidence to alter the outcome. *See Norden v. Barnhart*, 77 Fed.Appx. 221, 224 (5th Cir. 2003) (citations omitted). Nevertheless, the ALJ's decision to order a consultative examination is within his discretion. *Id.* Absent any evidence of prejudice, the Court finds no reversible error.

## III.  <u>Conclusion</u>

Although the ALJ erred at Step Three, because the error was harmless and the ALJ's decision is supported by substantial evidence;

27

IT IS RECOMMENDED that the final decision of the Commissioner is AFFIRMED, and that Locker's appeal be DENIED and DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), parties aggrieved by this Report and Recommendation have seven (7) calendar days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within seven (7) days after being served with a copy thereof.  No other briefs (such as supplemental objections, reply briefs, etc.) may be filed.  Providing a courtesy copy of the objection to the undersigned is neither required nor encouraged. Timely objections will be considered by the District Judge before a final ruling.

Failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS DONE AND SIGNED in chambers in Alexandria, Louisiana, this _15th_ day of September, 2022.

_____
JOSEPH H.L. PEREZ-MONTES
UNITED STATES MAGISTRATE JUDGE